**The below described is SIGNED.**



**Dated: December 07, 2010** _____

**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**FELECIA C. MALONEY,**<br><br>Debtor. | Case No. 09-20450<br><br>Chapter 7 |
| **JOHN J. CHRISTIANSEN TRUST, BRAD J. CHRISTIANSEN,** Trustee and **RACQUELLE STOTT,** Trustee,<br><br>Plaintiffs**,**<br>v.<br><br>**FELECIA C. MALONEY,**<br><br>Defendant. | Adversary Proceeding No. 09-2210<br><br>Judge Joel T. Marker |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The transfer of a family business from one generation to the next can be a difficult process, sometimes resulting in conflict between relatives in active management and those with only an economic interest in the success of the enterprise.   This adversary proceeding is the third lawsuit between the members of the second generation over the affairs of their father's jewelry store.   The plaintiffs in this case, the John J. Christiansen Trust, and Brad J. Christiansen and Racquelle Stott in their capacity as trustees (collectively the "Trust" or "Plaintiffs"), initiated this adversary

proceeding on May 27, 2009.  The Plaintiffs filed an amended complaint on August 17, 2009

asking the Court to find that certain debts owed to the Trust are nondischargeable under 11 U.S.C.

§ 523(a)(2)(A), (4), and (6)[1] and asking the Court to deny the Debtor, Felecia C. Maloney

("Maloney"), a discharge under § 727(a)(2), (3), (4), and (5).[2]   A trial was held on November 15

and 16, 2010.   After the presentation of evidence and argument, the Court took the matter under

advisement.

       The Court has considered the evidence properly before it, assessed the credibility of the

witnesses, considered the arguments of counsel, and conducted an independent review of

applicable law.   Based on the foregoing, the Court makes the following findings of fact and

conclusions of law.[3]

## I.    JURISDICTION

       This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a), and venue is appropriate

under 28 U.S.C. §§ 1408 and 1409.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and

(J), and the Court may enter a final order.

---

[1]       All future statutory references are to title 11 of the United States Code unless otherwise indicated.

[2]       At trial, the Plaintiffs waived the § 727(a)(2) claim for relief.

[3]       These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and
conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal
Rule of Bankruptcy Procedure 7052, and incorporates by reference all of the Court's oral rulings made on
the record during trial.   Any of the findings of fact herein are also deemed to be conclusions of law and
conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.

## II.    FINDINGS OF FACT

The following findings of fact are established by admissions in the pleadings, by stipulation of counsel, or through testimony or other evidence provided at trial.[4]

1.    Before January 7, 1998, John J. Christiansen operated a jewelry store in Ogden, Utah through John's Jewelry, Inc., a Utah corporation.

2.    During the time he owned the business, John's children Maloney, Ned Christiansen, Brad Christiansen, and Racquelle Stott helped him operate the store.

3.    Maloney took a specific interest in the jewelry business.    She became a certified gemologist, she designed jewelry, and she learned to manage the employees of the store and the business itself.

4.    *On January 7, 1998, Maloney agreed to pay to her father and/or his successor the amount of $382,000 to purchase all inventory, equipment, fixtures, and stock in John's Jewelry, Inc. (Purchase Agreement).

5.    The Purchase Agreement was entered between Maloney as the "Buyer" and John J. Christiansen as the "Seller, shareholder of John's Jewelry, Inc. (Corporation)" and indicates that "[t]he Seller desires to sell all of his shares in Corporation to Buyer, and Buyer desires to purchase all of Seller's shares in Corporation."[5]

---

[4]    Findings of fact marked with an asterisk are taken from the Pretrial Order with only minor changes.

[5]    Ex. 34.

3

6.      The Purchase Agreement required Maloney to make "179 monthly payments of $3,163.88."[6]  The monthly payments were due on the 15th day of each month beginning with February 15, 1998.

7.      The Purchase Agreement also required Maloney to execute a Promissory Note that "shall be secured by the Corporation's stock, equipment and inventory."[7]

8.      The Promissory Note and Security Agreement are both attached as exhibits to the Purchase Agreement.

9.      Under paragraph 3.5 of the Purchase Agreement, the Seller maintained the right to inspect the premises and the financial records of the store, and Maloney was required "to maintain the inventory level at a level equal to at least 75% of its present value and maintain the Corporation's net book value as of the date of sale."[8]

10.     Paragraph 5 of the Promissory Note indicates that "[t]his Note is secured by the stock and assets of John's Jewelry, Inc."[9]

11.     The Security Agreement provides: "Buyer hereby grants to Seller a security interest in all Collateral (as defined in paragraph 2 of this Agreement) that has been sold by Seller to Buyer."[10]

12.     The Collateral is described as:

    a.      All stock certificates of John's Jewelry, Inc.

---

[6]     *Id.*

[7]     *Id.*

[8]     *Id.*

[9]     *Id.*

[10]    *Id.*

4

      b.     All assets and equipment located in the jewelry store

      c.     All inventory located in the premises of John's Jewelry, Inc.

      d.     All proceeds, increase and products of said Collateral.[11]

13.     Paragraph 3.b. of the Security Agreement required Maloney "not to sell or encumber any of the Collateral until the Promissory Note has been paid in full or until she has received written permission from Seller to sell a particular item of equipment.  This does not preclude Buyer from selling inventory in the ordinary course of business."[12]

14.     The Security Agreement was signed by Maloney as "Buyer," by John J. Christiansen as "Seller," and by John J. Christiansen for John's Jewelry, Inc.

15.     A UCC-1 financing statement describing the collateral and evidencing the Security Agreement was filed with the Department of Commerce, Division of Corporations & Commercial Code on January 8, 1998.   The UCC-1 lists Maloney as the debtor and John J. Christiansen as the secured party with the collateral described as "All stock in John's Jewelry, Inc.   All equipment and inventory located at John's Jewelry, Inc., 3920 Washington Blvd., Ogden, Utah and all proceeds thereof."[13]   The financing statement lapsed January 8, 2003.

16.     On November 30, 2000, John J. Christiansen assigned his interest in the Purchase Agreement to the Trust.   The assignment indicated that all future payments from Maloney should be made to the Trust and identified John and Ardith Christiansen "or successors" as trustees.[14]   Brad Christiansen testified that the Trust assets were to be divided in four shares and distributed among himself, Maloney, Racquelle Stott, and Ned Christiansen.

---

[11]   *Id.*

[12]   *Id.*

[13]   Ex. 40.

[14]   Ex. 39.

17.    John J. Christiansen died in 2001.   He continued to work in the store prior to his death.

18.    Ardith B. Christiansen died in April 2005.

19.    Before the death of her parents, Maloney had never defaulted under the terms of the Purchase Agreement.

20.    Maloney issued a check for the April 2005 payment but stopped payment on the check shortly after her mother's death.   Maloney explained that she didn't know who was acting as successor trustee of the Trust and was no longer sure where to send the monthly payment.

21.    Maloney testified that after her mother's death, she opened a new bank account and deposited the monthly payment into that account.

22.    Sometime before March 2006, Maloney requested a copy of the Trust Agreement from her brother Brad Christiansen so that she could verify that Brad Christiansen and Racquelle Stott were the successor trustees.   Brad Christiansen refused to provide Maloney with a copy of the Trust Agreement.

23.    At trial, Brad Christiansen testified that he refused the request because he was scared of what Maloney and an attorney could do with the documents.

24.    In February 2006, Maloney offered to pay to the Trustees the monthly payments that had come due since their mother's death, but the Trustees refused to accept the money.

25.    Instead, on March 7, 2006 the Trustees, on behalf of the Trust, filed a complaint against Maloney and John's Jewelry, Inc. in the Second Judicial District Court for the State of Utah, Civil No. 060901238 ("First State Court Action") claiming that Maloney had failed to make

monthly payments under the terms of the Purchase Agreement and specifically alleging breach of contract and breach of security agreement.[15]

26.      After the filing of the First State Court Action, Maloney made all monthly payments into the state court.

27.      On January 10, 2007, the judge in the First State Court Action issued a ruling partially granting Maloney's motion for summary judgment.[16]  The state court found that Maloney made a reasonable request for verification from Brad Christiansen and Racquelle Stott that they were the successor trustees of the trust, that the siblings' say-so was not sufficient to justify tendering to them several hundred thousand dollars owing on the Promissory Note, and that the Trustees had acted unreasonably in refusing to provide Maloney with the requested trust documentation.  The state court found that the Trustees should not benefit from the confusion they caused and granted Maloney's motion to dismiss the Trustees' claim to accelerate the note. The state court then stayed the balance of the case pending mediation.

28.      On August 21, 2007, John's Jewelry, Inc., through its president, Maloney, entered into Loan No. 9005 with Zions First National Bank, borrowing $150,000 secured by the corporation's inventory, accounts, and general intangibles.[17]  The loan proceeds satisfied an existing debt of the corporation to Zions secured by the same collateral and provided additional operating capital for the business.

29.      Maloney testified that it was regular practice for the business to roll existing loans into new financing agreements to maintain a balance of available cash for the store.  Maloney

---

[15]      Ex. J.

[16]      Ex. L.

[17]      Ex. 1, 2, 3, and 4.

testified that the August 21, 2007 transaction with Zions Bank was this type of transaction and that at the time she did not believe that the Trust had a security interest in the collateral pledged to secure this loan.[18]

30.    Maloney also testified that it was her regular business practice to use the American Express corporate credit card to make personal purchases.[19]  Maloney maintained a ledger tracking the amounts owed to her personally for jewelry she sold at the store on consignment, totaling $14,566.[20]  She used these amounts to offset the personal charges on the American Express credit card.

31.    The personal charges on the American Express corporate credit card that are attributed to Maloney's personal charges totaled $11,819.[21]  Tarina Chase, a certified public accountant since 1995, testified that she had prepared the financial statements and tax returns for John's Jewelry, Inc. since at least 2004, that all of the corporation's accounts were reconciled through September 2009, and that she was not aware of any misappropriation of credit card deposits.

32.    As of September 30, 2005, the corporation's financial statement includes a line item asset listed as "Due From Officer" in the amount of $60,976.81.[22]  By June 30, 2006, this

---

[18]    *See* Ex. E which is a UCC-1 filed by Zions Bank perfecting its security interest beginning October 29, 2002.

[19]    Ex. 27.

[20]    Ex. H.

[21]    On day two of the trial, Plaintiffs' counsel presented the Court with a new Exhibit 27 indicating with a "P" the personal charges made on the American Express corporate credit card.   The Court replaced the original Exhibit 27 with the version marked with "P" for all personal charges and received the new exhibit.

[22]    Ex. 10.

amount had increased to $105,287.85[23] and then to $140,840 by then end of the tax year in 2007.[24]

Tarina Chase testified that these figures accounted for payments made by the corporation to the

Trust for Maloney's obligation under the Purchase Agreement and that this method of accounting

for the payments predated her first employment by the corporation.

33.     The store's 2007 corporate tax returns show a cash distribution of $10,500, but

Maloney testified that she did not receive a $10,500 cash distribution and that this must have been

an accounting adjustment.   Tarina Chase was not asked to clarify this issue during her testimony.

34.     On December 27, 2007, Maloney and the Trustees participated in a mediation that

resulted in settlement of the First State Court Action.

35.     The Settlement Agreement memorializing the agreement reached at the mediation

was executed on March 24, 2008.[25]   As part of the settlement, the Trust paid $29,132.83 of

Maloney's attorneys fees.

36.     The Settlement Agreement required Maloney to make all future payments into an

escrow account to be established by the Trust and indicated that "[t]he Trust shall retain all rights

and remedies under the [Settlement Agreement] to foreclose in the event of a default."[26]

37.     A few days after the Settlement Agreement was signed, Maloney decided to close

the store.   Sales were down in the first few months of 2008.   Maloney also testified that the price

of gold increased substantially during this time.   This resulted in increased operational costs and

increases in the price of inventory.   It was during this time that the store usually purchased

---

[23]     Ex. 11.

[24]     Ex. 12.

[25]     Ex. 19.

[26]     *Id.*

inventory for the following Christmas season.  Taking into consideration the increased cost of operations, the decline in sales, and the increase in gold prices, Maloney decided that it would be prudent to liquidate the existing inventory, close down the store, and pay all creditors including vendors, Zions Bank, and the Trust.

38.   Maloney also testified at trial that she "wanted to get her siblings [the Plaintiffs] off her back."

39.   Between the months of April and June 2008, Maloney began liquidating the inventory of the store by holding sales and making arrangements to sell surplus inventory on consignment at other locations.

40.   *On or about June 30, 2008, the store closed its doors and ceased doing business.

41.   At the time the store closed, Maloney prepared an inventory of all of the remaining items in the store.

42.   The final stocklist shows inventory at cost of $241,242.01 and a retail price of $584,868.56.[27]

43.   After the store closed, Maloney took the remaining inventory and placed it in a safe deposit box at Zions Bank.   Any items that did not fit in the box were taken to her house.

44.   Maloney was the only individual who had access to the safe deposit box.

45.   Maloney testified that much of the remaining furniture, hardware, and equipment (which was old and out-of-date) was given to "the church or the mission."

46.   In October 2008, the Trust initiated another law suit in the Second Judicial District Court, Civil No. 080904557 (Second State Court Action).

---

[27]      Ex. 30.

47.     Judgment against Maloney was entered in that case on December 13, 2008 awarding the Trust a money judgment of $153,105.14 plus interest.[28]

48.     Erkelens & Olson Auctioneers auctioned the remaining store inventory on December 13, 2008.[29]   The auction generated $21,168 in net proceeds.

49.     All of the unsold items were returned to Maloney after the December 2008 auction, and she returned the items to the safe deposit box.

50.     On January 5, 2010, Zions Bank performed an inventory of the safe deposit box. Brad Christiansen and the bank representative were the only parties present.

51.     Brad Christiansen testified that several of the items included on the store's final stocklist and on the Erkelens & Olson auction list were not in the safe deposit box after the January 5, 2010 inventory.   Prompted by his attorney who was reading from a list that was never produced to Maloney's counsel and was not admitted into evidence, Brad Christiansen identified specific items that were missing. When asked on cross examination if he could remember from memory which specific items were missing, Brad Christiansen admitted that he could not.   Many of the pieces identified by Brad Christiansen as missing were low value items that, in the aggregate, do not materially affect the Plaintiffs' claims.

52.     On or about February 10, 2010, the items remaining in the safe deposit box were auctioned resulting in gross sales of $39,611.[30]

53.     *Maloney filed a chapter 7 voluntary petition for relief under the Bankruptcy Code on January 19, 2009.

---

[28]     Ex. 29.

[29]     Ex. 31.

[30]     Ex. 41.

54.      *In connection with the bankruptcy filing, Maloney prepared and submitted statements and schedules for declaration of her financial status.[31]

55.      On Schedule A, Maloney listed the fair market value of her house located in Layton, Utah at $300,000.   She also disclosed a consensual mortgage lien against the residence in the amount of $244,876.61 and claimed a homestead exemption of $20,000.  At a deposition taken at a later date, Maloney testified that she thought the house might be worth $380,000.

56.      In response to the mortgage creditor's motion for relief from the automatic stay, the chapter 7 trustee stated that he determined that there was no equity to be realized for the benefit of creditors and he abandoned the residence as being of inconsequential value to the bankruptcy estate.[32]

57.      Maloney testified that in connection with preparing Schedule B, she made a list of all of her personal property including all jewelry which her attorney condensed, summarized, and then included on Schedule B.[33]

58.      Maloney admitted that she received personal property from the Trust including jewelry, artwork, a fishing rod, and other miscellaneous items, but that she did not have many of these items when she filed her chapter 7 bankruptcy petition.

59.      Maloney remembers receiving a few pieces of art but claims that any art was of modest value and either given to her ex-husband or donated to the mission.

---

[31]      Ex. 7 and 8.

[32]      Ex. B.

[33]      Ex. 8.

60.     Maloney admitted to receiving jewelry from the Trust but testified that she gave much of it away to her children or melted it down to sell the gold or to make new jewelry pieces because she did not have the same taste in jewelry as her mother.

61.     Maloney testified that any jewelry that she did keep was listed on Schedule B.

62.     Maloney valued the personal property listed on Schedule B based on the value it represented to her or the value it would take her as a gemologist and jewelry maker to replace, not the appraised value.[34]

63.     Maloney admitted at trial that she still had possession of the "wheat table" which was not specifically listed on Schedule B.   Debtor claims that she was unaware that this table was in her basement.

64.     *Plaintiffs have advised the chapter 7 trustee of Plaintiffs' claims regarding allegedly concealed or missing assets.

65.     *The chapter 7 trustee has fully administered the chapter 7 estate, and has, without formal objection from Plaintiffs, abandoned all personal property assets of the Debtor, with the exception of Maloney's 2008 tax refund which was administered in the estate.

66.     *Maloney was at all material times the sole shareholder of John's Jewelry, Inc. from January 7, 1998 until it ceased doing business in 2008.

67.     During the course of this proceeding Maloney has produced voluminous financial books and records, including the following: personal income tax returns for 2007, 2008, and 2009; store daily sales tally sheets; inventory lists; credit card statements; business financial statements for fiscal years through September 2008; corporate income tax returns for 2006 and 2007; check

---

[34]     *See* Ex. 37 for appraisal of certain jewelry by the Debtor.

13

ledger details for the period January 1, 2007 through July 31, 2008; 484 pages of bank statements;

asset depreciation schedules; and sales tax returns for 2007 and 2008.

### III.     DISCUSSION

The Plaintiffs are asking this Court to find that debts owed to the Trust are

nondischargeable under § 523(a) and to deny Maloney her discharge under § 727(a).   The Court

will examine each claim for relief.

### A.  Section 523

The Plaintiffs' initial claims for relief arise under § 523(a).   The Plaintiffs have the burden

of proof in establishing the elements of §523(a) claims.   To prevail, the Plaintiffs must establish

each of the requisite elements by a preponderance of the evidence.[35]   The preponderance standard

requires the Court to believe that the existence of a fact is more probable than its nonexistence

before the Court may find in favor of the party who has the burden to persuade the court of the

fact's existence.[36]   The exceptions to discharge contained in § 523(a) "are to be narrowly

construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the

debtor's favor."[37]

#### 1.  Section 523(a)(2)(A)

To establish that a claim is nondischargeable under § 523(a)(2)(A), a creditor must prove

the following elements: (l) the debtor made a false representation; (2) the debtor made the

---

[35]     *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (10th Cir. BAP 1999) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

[36]     *Alside Supply Ctr. Salt Lake City, Div. of Alside Supply, Inc. v. Aste (In re Aste)*, 129 B.R. 1012, 1015 n.8 (Bankr. D. Utah 1991).

[37]     *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss.[38]   Plaintiffs assert that Maloney committed actual fraud by entering into the Settlement Agreement with Plaintiffs knowing that she would be closing the store shortly thereafter and attempting to discharge any debt owed to the Trust in her bankruptcy case. Specifically, the Plaintiffs point to the close proximity of the date the Settlement Agreement was executed (March 24, 2008) and the time that Maloney made the decision to close the store (April 2008) as evidence of fraud.   The facts presented at trial dictate a different conclusion.

It is correct that the Settlement Agreement was executed shortly before Maloney decided to close the store, but the terms of the Settlement Agreement were reached in December 2007 at the mediation.   After the mediation, Maloney continued to operate the store and continued to make monthly payments to the Trust.   Sales declined in February and March of 2008, and the cost of gold began to rise in early 2008, which resulted in the prospect of a high cost inventory purchase for the upcoming Christmas season.   To maximize the increasing gold value of existing inventory and to avoid the expense of purchasing new inventory, Maloney made a business decision to close the store and to liquidate the remaining inventory, equipment, and furniture in order to pay all creditors, including the Trust.   The Court finds Maloney's explanation of her decision to close the store to be credible.   The Plaintiffs may not agree with Maloney's decision and may question her business judgment, but exercising questionable business judgment is not a basis for establishing fraud.   Furthermore, Maloney's continued payments to the Trust after the December mediation support Maloney's contention that her decision to close the store was based on the economics of

---

[38]      *Young*, 91 F.3d at 1373; *see also Field v. Mans*, 516 U.S. 59, 70-72 (1995) (establishing that the appropriate standard is justifiable reliance instead of reasonable reliance).

the situation and was not made with the intent to harm the interests of the Plaintiffs.  It is the

Plaintiffs' burden to establish by a preponderance of the evidence that Maloney made a false

representation with the intent to deceive the Plaintiffs, and the Plaintiffs have failed to do so.

### 2.   Section 523(a)(4)

Next, the Plaintiffs assert that the debt owed to the Trust should be found nondischargeble

under § 523(a)(4).  "[A] finding of nondischargeability under section 523(a)(4) requires a

showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party,

and (2) a defalcation committed by the debtor in the course of that fiduciary relationship."[39]

Whether Maloney is a fiduciary under § 523(a)(4) is a question of federal law, and the Defendant is

only considered a fiduciary if an express, technical, or statutory trust is present.[40]

The Plaintiffs assert two theories under which a fiduciary relationship would arise.  First,

the Plaintiffs assert that paragraph 3.5 of the Purchase Agreement which required Maloney to

maintain the inventory of the store at a certain level created a fiduciary relationship between the

Trust and Maloney.   The Court disagrees.   To establish an express trust, the Plaintiffs must show

"(1) sufficient words to create a trust, (2) a clearly defined trust res, and (3) an intent to create a

trust relationship."[41]   The plain language of the Purchase Agreement establishes that this was a

purchase contract.   The Purchase Agreement does not include sufficient words to create a trust, it

does not clearly define a trust res, and there is nothing in the Purchase Agreement showing that

---

[39]     *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP
1997) (internal citation omitted).

[40]     *Young*, 91 F.3d at 1371.

[41]     *Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 91 B.R. 961, 965 (D. Utah 1988) (citing *In
re Kwiat*, 62 B.R. 818, 821 (Bankr. D. Mass 1986)) *rev'd on other grounds* by *In re Twitchell*, 892 F.2d 86
(10th Cir. 1989) (table).   The Tenth Circuit reversed the district court's *Twitchell* decision but the standard
cited in this opinion is still the applicable standard in the Tenth Circuit.

16

Maloney and John J. Christiansen intended to create a trust relationship.   Furthermore,"[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith . . . nor an inequality between the parties' knowledge or bargaining power . . . is sufficient to establish a fiduciary relationship for the purposes of dischargeability."[42]   The relationship between Maloney and the Trust was a contractual one, and "[a] merely contractual relationship is less than what is required to establish the existence of a fiduciary relationship."[43]

Second, Plaintiffs assert that a fiduciary relationship should be imposed upon Maloney because she was the only corporate officer of John Jewelry, Inc., she owes a fiduciary relationship to the creditors of the corporation, and she abused that fiduciary relationship when she used her position to gain personal benefits.   This is known as the trust fund doctrine, and it is established under Utah state law.[44]   The trust fund doctrine provides that "the assets of a dissolved corporation become a trust fund against which the corporation's creditors have a claim."[45]   In order to establish a claim under the trust fund doctrine, the Plaintiffs must show that the corporation was insolvent at the time of the transfer.   The Plaintiffs have failed to do so.   The

---

[42]      *Young*, 91 F.3d at 1371-72.

[43]      *Legendary Loan Link, LLP v. Glatt (In re Glatt)*, 315 B.R. 511, 521 (Bankr. D.N.D. 2004).   *See also Fowler & Peth, Inc. v. Regan (In re Regan)*, 311 B.R. 271, 275 (Bankr. D. Colo. 2004) (stating that "Federal law limits [§ 523(a)(4)'s] application to express and technical trusts, and debts alleged to be non-dischargeable must arise from breach of trust obligations imposed by law, separate and distinct from any breach of contract" but finding that a statutory trust existed under Colorado's mechanic's lien law).

[44]      "Courts have consistently considered state law relevant in determining whether a technical [or statutory] trust relationship exists for purposes of the Bankruptcy Code."   *M-R Sullivan Manufacturing Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 675 (Bankr. D. Mass. 1998).   In *Brigham Young University v. Tremco Consultants, Inc.,* 156 P.3d 782, 791 (Utah 2007), the Utah Supreme Court indicated that Utah Code Ann. § 16-10a-1408 codified the equitable theory known as the trust fund doctrine.   That provision of the Utah Code provides that "[a] claim may be enforced . . . against the dissolved corporation, to the extent of its undistributed assets; or against a shareholder of the dissolved corporation, if the assets have been distributed in liquidation."

[45]      *Tremco Consultants, Inc.*, 156 P.3d at 791 (internal citations and quotations omitted).

Plaintiffs did establish that Maloney liquidated the store and closed its doors in June 2008.   The

Plaintiffs also established that numerous auctions were held resulting in the sale of the store's

inventory.   Brad Christiansen testified that as of November 15, 2010, the Trust was owed

approximately $177,000.   But in response, Maloney testified that it was her opinion, as the

individual who had operated the store for over 10 years, that at the time she decided to close the

store, there was sufficient inventory to liquidate and pay all creditors including the Trust.

Maloney's liquidation plans were thwarted by the Trust's collection efforts, and Maloney was not

allowed to further liquidate the store's assets after the Trust commenced the Second State Court

Action.   The Trust has established that Maloney did not pay the debt owed to it, but the Trust has

failed to establish at what point the store became insolvent and which transfers occurred after

insolvency.   Without such evidence, the trust fund doctrine cannot be established and cannot be

used as a basis for a claim under § 523(a)(4).   Furthermore, courts in the Tenth Circuit have

narrowly construed § 523(a)(4) and have been slow to extend its application beyond anything

other than an express or statutory trust.   Consequently, this Court will not extend its application to

the facts of this case.   Based on this analysis, the Court finds that the Plaintiffs have failed to

prove that they are entitled to relief under § 523(a)(4).

### 3.   Section 523(a)(6)

The Plaintiffs argue that the debt to the Trust should be found nondischargeable under

§ 523(a)(6) because Maloney converted the collateral she had pledged as security to the Trust in

the Purchase Agreement then disposed of it without remitting payment to the Trust.   The

Plaintiffs allege that she did so with the specific intent to injure the Trust's security interest in the

collateral and that her actions were without justification or excuse.   In response, Maloney asserts

three defenses: that the store was not a party to the Purchase and Security Agreements and that

18

only Maloney's assets were pledged as security to the Trust; that Maloney did not injure the Trust's security interest by pledging the store's inventory as collateral to secure subsequent loans; and that Maloney's actions were neither willful nor malicious.

Section 523(a)(6) excepts debts from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Plaintiffs must prove by a preponderance of the evidence that the alleged injury was both willful and malicious. As the United States Supreme Court has explained, the word "willful" in § 523(a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.[46] In order to establish that the injury was willful, the Plaintiffs must show that Maloney knew of and intended to cause an injury either to the Plaintiffs or to their property rights.

Before determining whether Maloney has injured a property right of the Plaintiffs, the Court must first decide whether or not the Trust had a property right that could be damaged. After reviewing the Purchase Agreement, including the Promissory Note and the Security Agreement, the Court finds that the document is ambiguous. The Purchase Agreement was entered into between Felecia Maloney as Buyer and John J. Christiansen as Seller, shareholder of John's Jewelry, Inc. (Corporation). The Security Agreement which was attached to the Purchase Agreement as Exhibit B was entered into between John J. Christiansen, Seller, and Felicia Maloney, Buyer. The Security Agreement provides: "Buyer hereby grants to Seller a security interest in all Collateral (as defined in paragraph 2 of this Agreement) that has been sold by Seller to Buyer." Paragraph 2 defines the collateral as "all stock certificates of John's Jewelry, Inc., all

---

[46]     *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 61 (1998).

assets and equipment located in the jewelry store at 3920 Washington Boulevard, Ogden, Utah, all

inventory located in the premises of John's Jewelry, Inc. at 3920 Washington Boulevard, Ogden,

Utah, and all proceeds, increase and products of said collateral."   The Security Agreement was

signed by Maloney and John J. Christiansen as "Seller" and "for John's Jewelry, Inc."   Paragraph

3.b. of the Security Agreement indicates that "the Buyer [Maloney] shall not sell or encumber any

of the Collateral until the Promissory Note has been paid in full or until she has received written

permission from Seller to sell a particular item of equipment," but the Security Agreement itself

doesn't list the store as a party.   Absent from the first paragraph of the Security Agreement is any

specific reference to the store.   To further confuse matters, the Security Agreement is signed by

John J. Christiansen personally and on behalf of the store.   "[I]t is axiomatic that a contract should

be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be

given effect if it is possible to do so."[47]   In attempting to read the Purchase Agreement as a whole,

the Court finds that it is ambiguous and because the agreement is ambiguous, the Court will

consider parol evidence to ascertain the intent of the parties.

The provisions cited above make the contract susceptible to two contrary yet equally

tenable interpretations: the first being that John J. Christiansen and Maloney intended to grant John

J. Christiansen a security interest in all of the store's assets; the second being that the parties to the

agreement intended to grant John J. Christiansen a security interest only in Maloney's personal

assets.   At trial, Maloney denied that she intended to grant her father a security interest in the

store's assets, but the UCC-1 filed on January 8, 1998 indicates that Maloney granted to John J.

Christiansen a security interest in "[a]ll stock in John's Jewelry Inc.   All equipment and inventory

---

[47]      *Gillmo v. Macey*, 121 P.3d 57, 65 (Utah App. 2005) (internal citations and quotations omitted).

located at John's Jewelry, Inc., 3920 Washington Blvd., Ogden, Utah and all proceeds thereof." This document reflects that Maloney and John J. Christiansen were the parties to the agreements but that the security interest granted to John J. Christiansen extended to all of the equipment and inventory located at the store and its proceeds.   Having considered all of the evidence before it, and in attempting to read the Purchase Agreement which includes the Security Agreement and the Promissory Note together as a whole and giving effect to *all* of its provisions, the Court finds that Maloney and John J. Christiansen (personally and as the owner and only shareholder of the store before January 7, 1998) intended that Maloney grant to John. J. Christiansen a security interest in the store's assets as well as any proceeds derived therefrom.

Having found that the Trust had a security interest in the assets of the store, the Court must now examine whether Maloney willfully and maliciously injured that security interest.   In order to establish that the injury was willful, the Trust must show that Maloney knew of and intended to cause an injury either to the Trust or to its property rights.   The Trust contends that Maloney injured its security interest when she caused the corporation to pledge the store's assets as collateral for other loans contrary to paragraph 3.b. of the Security Agreement and when she misappropriated and dissipated the store's assets for her own personal benefit.

It is undisputed that Maloney caused the corporation to grant Zions Bank a security interest in the store's collateral contrary to paragraph 3.b. of the Security Agreement.   The question the Court must answer is whether she did so with the intent to injure the Trust's security interest.   The Court finds that Maloney did not intend to injure the Trust's interest for two reasons.   First, granting a creditor a security interest in collateral that is already encumbered does not do violence to the original creditor's security interest.   The original creditor (if it has properly perfected its security interest) remains in first position and will receive the first distribution if the collateral is

21

sold.   The issue here is whether Maloney's failure to comply with paragraph 3.b. of the Security

Agreement was willful and malicious.

Second, paragraph 3.b. of the Security Agreement required Maloney to obtain written

permission from the Seller before encumbering the collateral.   There is no evidence before the

Court showing that Maloney complied with this provision.   But at the outset, it should be noted

that this was not a typical commercial transaction.   This was the purchase of a family business

with the founder and father as the seller and the daughter as the buyer.   John J. Christiansen had

groomed his daughter to take over the store.   He trained her in business operations, sales, and

finance.   Specifically, he taught her how to keep a line of credit available to the store for

operations by encumbering its assets.   In executing the August 21, 2007 Zions Bank documents

(which renewed an existing obligation dating back to at least 2002), Maloney was merely

attempting to continue business operations as usual.   There is no evidence that she did so with the

intent to injure the Trust's security interest in the store's assets --- she was merely doing what her

father had taught her to do.   Furthermore, Maloney's actions were justified because she

encumbered the assets of the store in an attempt to maintain the store's access to cash that may

have been needed to continue business operations.   As a result, her action of encumbering the

collateral was not willful and malicious.

The Court also finds that Maloney did not misappropriate and dissipate the store's assets

with the intent of destroying the Trust's security interest.   Maloney adequately explained her use

of the American Express corporate card and the system of accounting she used to reimburse the

store for her personal charges, a practice employed by other family members when they worked at

the store.   She sufficiently explained the $10,500 cash distribution reflected on the 2007 corporate

tax returns and the increase in the debt she owed to the store.   The testimony regarding the

missing inventory after the store was closed was inconclusive.   A small amount of inventory appeared to be missing and the Plaintiffs attempted to place the blame on Maloney, but the testimony regarding the missing items was vague and was based on a document not produced to Maloney's counsel and not admitted into evidence.

The evidence before the Court also shows that Maloney had legitimate business reasons for closing the store and beginning the orderly liquidation of its assets.   The final stocklist Maloney prepared after the store closed shows inventory with a cost value of $241,242.01 and a retail price value of $584,868.56.   As stated before, the Trust may not have agreed with Maloney's decision to close the store or her course of action in initiating liquidation, but Maloney was not required to continue to operate a failing business *in omne tempus* (forever) just so she could make good on her obligation to the Trust.   Such a requirement would be akin to indentured servitude and is an untenable position.   Maloney exercised her business judgment in deciding to close the store, and the preponderance of the evidence does not establish that she did so with the specific intent of injuring the Trust's security interest.

The Plaintiffs make much of Maloney's statement that she wanted "to get her siblings off her back."   But a review of the case shows that the parties have been in litigation since 2005.   All must be suffering from litigation fatigue.   This isolated statement made during cross examination is not itself sufficient to establish that Maloney's alleged misappropriation of corporate funds and her decision to close the store were done with the specific intent of harming the Trust and its security interest.   Having reviewed all of the evidence, the Court finds that the Trust has failed to shoulder its burden of establishing by a preponderance of the evidence that Maloney willfully and maliciously injured the Trust's property.

23

B.   **Section 727**

The Plaintiffs assert that Maloney is not entitled to a discharge under three provisions of

§ 727(a) of the Bankruptcy Code: failure to maintain adequate books and records under

§ 727(a)(3); making a false oath or account under § 727(a)(4); and failure to explain the loss of

assets under § 727(a)(5).   The Plaintiffs bear the burden of proof, and they must prove each

element of § 727(a)(3), (a)(4), or (a)(5) by a preponderance of the evidence.[48]

1.   **Section 727(a)(3)**

Under § 727(a)(3), the Court must deny a debtor's discharge if:

[T]he debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
preserve any recorded information, including books, documents, records, and
papers, from which the debtor's financial condition or business transactions might
be ascertained, unless such act or failure to act was justified under all of the
circumstances of the case.[49]

In order to prevail on their § 727(a)(3) claim for relief, the Plaintiffs must prove (1) that Maloney

failed to maintain and preserve adequate records; and (2) that the "failure made it *impossible* to

ascertain [her] financial condition and *material* business transactions."[50]   If Plaintiffs can

establish these elements, the burden shifts to Maloney to justify her failure to maintain financial

records.[51]   The Tenth Circuit has further explained that "'[r]ecords need not be so complete that

they state in detail all or substantially all of the transactions taking place in the course of the

---

[48]      *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991).

[49]      Section 727(a)(3).

[50]      *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (emphasis in original);
*Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. B.A.P. 2001).   *See also United
States v. Ellis*, 50 F.3d 419, 425 (7th Cir. 1995) (holding that § 727 makes a complete financial disclosure a
condition precedent to discharge).

[51]      *Brown*, 108 F.3d at 1295.

business.   It is enough if they sufficiently identify the transaction that intelligent inquiry can be made respecting them.'"[52]   Other than comments made in passing that it was not provided with the store's final tax returns and apparent confusion regarding the dissipation of the store's assets, the Plaintiffs fail to point the Court to any specific financial documents that were missing which made it impossible to ascertain the financial condition of either Maloney or the corporation.   Maloney provided volumes of documents to the Trust evidencing the store's financial and accounting records.   Maloney employed a CPA to reconcile the store's accounting records and to prepare tax returns, and there was no evidence or argument presented indicating that Maloney failed to keep other personal financial records.   The accountant and/or Maloney were able to provide explanations regarding the transfer of certain assets.   The financial records produced by Maloney were not so incomplete as to make it impossible to ascertain the financial condition of Maloney or the corporation.   As a result, the Trust's claim for relief under § 727(a)(3) fails.

**2.   Section 727(a)(4)**

Under § 727(a)(4)(A), "a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made a false oath and that the oath relates to a material fact."[53]   "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence . . . .   Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge."[54]   Once the plaintiff has established that a false oath has been made regarding a material fact, it is incumbent upon the defendant to provide a credible explanation for her actions.[55]

---

[52]   *Stewart,* 263 B.R. at 615 (citing *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939)).

[53]   *First Nat'l Bank, Larned v. Davison*, no. KS-04-013, 01-23974-7, 02-6018, 2004 WL 2852352, *3 (10th Cir. BAP June 29, 2004) (citing *Gullickson v. Brown* (*In re Brown*), 108 F.3d 1290, 1294 (10th Cir. 1997)).

[54]   *Gullickson* 108 F.3d at 1295-6 (internal citations omitted).

The Plaintiffs allege that Maloney knowingly and fraudulently made a false oath when she failed to list or to accurately value the following in her Statement of Financial Affairs and Schedules: jewelry given to her by the Trust; dolls from her mother's collection; artwork; a fishing rod; and the wheat table.   The Plaintiffs also assert that Maloney failed to accurately list the value of her home on Schedule A because she later testified that she thought the home might actually be worth $380,000.   This testimony was given during a deposition and after Maloney had reexamined the value of the home in conjunction with her pending divorce.   The Plaintiffs brought this discrepancy to the attention of the chapter 7 trustee, who determined that the home was encumbered and of inconsequential value to the estate.   At the time Maloney completed Schedule A, it was her honest belief that her home was worth $300,000 and, therefore, Maloney did not make a false oath.[56]

As for the personal property that was allegedly omitted from the Schedules or was undervalued on the Schedules, the Court finds that any omissions were either due to mistake and/or inadvertence or were immaterial.   Maloney testified that she prepared a list of all of the jewelry she had received from the Trust that was still in her possession when she filed her chapter 7 petition, that she gave this list to her attorney, and that he condensed it, summarized it, and used it to prepare Schedule B.   Maloney testified that before filing, she had given some of the jewelry to her children and had melted down some of the other pieces to either sell or to refabricate.   She also testified that the values assigned to the jewelry pieces were based on the cost it would take for her as a gemologist and jewelry maker to replace those items.   Maloney did list her mother's doll

---

[55]    *Trustee v. Halishak (In re Halishak),* 337 B.R. 620, 627 (Bankr. N.D. Ohio 2005).

[56]    *See In re Omang,* 403 B.R. 647, 653 (Bankr. D. Minn. 2009) (indicating that a debtor's value of property disclosed on the schedules, if made in good faith, is not a basis for denial of discharge simply because the valuation turns out to be wrong).

26

collection on Schedule B but valued those pieces of the collection at $50.   Plaintiffs attempted to

establish that the collection was grossly undervalued by admitting a ledger prepared by their

mother showing the dates she purchased the dolls and the price of each doll and by showing that

Maloney herself had appraised the dolls at a higher value for the purpose of the Trust's

distributions.   Maloney explained that the Trust beneficiaries agreed to use the values reflected in

their mother's ledger for the purposes of calculating the Trust distributions, but that these values

did not actually reflect what the dolls were worth.   The Court finds that these explanations are

sufficient to demonstrate that Maloney did not knowingly or fraudulently make a false oath as to

these specific items.

Maloney testified that she was given a lot of "stuff" from the Trust and that it continually

cluttered up her garage.   So, she took what she wanted, she told her kids and ex-husband to come

over and get what they wanted, then she donated the rest of the items to the mission.   Maloney

admits that she failed to include the wheat table on Schedule B because she was not aware that the

table was still in her basement.   This omission was due merely to her mistaken belief that she had

donated the wheat table and is not a sufficient basis upon which to deny Maloney her discharge.

Maloney also admits that she failed to include the fishing rod on Schedule B.   No explanation was

given regarding the failure to include the fishing rod, but the Court finds this omission to be

immaterial.   Finally, Maloney explained that she did receive some artwork from the Trust but that

she considered it to be "junk," that she gave one piece to her ex-husband, and that the she simply

forgot to include the other valueless pieces on Schedule B.   Again, Maloney's failure to list one or

two pieces of art which she considered to be of little value was merely due to inadvertence.   This

omission does not show that Maloney knowingly and fraudulently made a false oath.   As they had

with the home valuation issue, the Plaintiffs brought these alleged omissions to the attention of the

27

chapter 7 trustee and again, the chapter 7 trustee has, without formal objection from the Plaintiffs, abandoned all of Maloney's personal property assets.   These alleged omissions are simply insufficient to show that Maloney knowingly and fraudulently made a false oath or account.   As a result, the Plaintiffs' claim for relief under § 727(a)(4) fails.

### 3. Section 727(a)(5)

Section 727(a)(5) requires this Court to deny the Debtor's discharge if she has failed to satisfactorily explain any loss of assets or deficiency of assets to meet her liabilities.   The § 727(a)(5) claim requires this Court to examine whether Maloney's explanation satisfactorily describes what happened to assets, not whether what happened to assets was proper.[57]   The Court has summarized at length Maloney's explanations regarding the dissipation of the assets from the store and the dissipation of the assets she received from the Trust and need not repeat its findings here.   The Court finds that Maloney has satisfactorily described what has happened to the store's assets and her own personal assets and that no claim for relief under § 727(a)(5) has been established.

## IV.   CONCLUSION

This case of family conflict has involved years of litigation and unfortunately ends now with a family business closed and siblings divided.   The Court has found that the Trust has failed to establish by a preponderance of the evidence that it is entitled to relief under § 523 and § 727. As a result, the Court DENIES the relief requested and DISMISSES the amended complaint.   An

---

[57]    *Shappells, Inc. v. Perry* (*In re Perry*), 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000); *Buckeye Retirement Props. of Indiana, LLC v. Tauber* (*In re Tauber*), 349 B.R. 540, 564 (Bankr. N.D. Ind. 2006) (stating that, for purposes of § 727(a)(5), "the debtor does not need to justify the wisdom or prudence in the disposition of assets").

order reflecting this ruling will be issued contemporaneously with these Findings of Fact and

Conclusions of Law.

------------------------------------------------- END OF DOCUMENT -------------------------------------

_____ooo0ooo_____

**SERVICE LIST**

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** will be effected through the Bankruptcy Noticing Center to each party listed below.


M. Darin Hammond
Smith Knowles
4723 Harrison Blvd.
Suite 200
Ogden, UT 84403
  *Counsel for Plaintiffs*

Chris L. Schmutz
Schmutz & Mohlman
533 West 2600 S
Ste 200
Bountiful, UT 84010
  *Counsel for Debtor*